Filed 7/29/16  In re R.B. CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| In re R.B., a Person Coming Under the Juvenile Court Law. | C079824 |
| SACRAMENTO COUNTY DEPARTMENT OF HEALTH AND HUMAN SERVICES, Plaintiff and Respondent, v. K.B. et al., Defendants and Appellants. | (Super. Ct. No. JD233219) |

Kristen B. and David C., parents of the minor, appeal from orders of the juvenile court terminating their parental rights. (Welf. & Inst. Code, §§ 366.26, 395.)[1] Father contends there was insufficient evidence that placing the minor with him would be detrimental to the minor. Father further contends the tribes were not provided updated notices required by the Indian Child Welfare Act (ICWA) (25 U.S.C. § 1901 et seq.) after

_____

[1] Further undesignated statutory references are to the Welfare and Institutions Code.

1

he was found to be the minor's biological father. Mother argues the juvenile court erred in failing to apply the substantive provisions of the ICWA because the minor was eligible for membership in the North Fork Rancheria Band of Mono Indians (North Fork Rancheria) and joins in the arguments made by father. The minor argues the court erred in failing to treat him as an Indian child and providing the additional protections due to him.[2] We conclude substantial evidence supported the juvenile court's finding that placing the minor with father would be detrimental to the minor. However, because the Department of Health and Human Services (Department) failed to ascertain the minor's actual status prior to completion of the section 366.26 hearing, conditional reversal is required to determine the minor's ICWA status and whether the substantive provisions of the ICWA should have been applied at that hearing.

## I. BACKGROUND[3]

The Department filed a section 300 petition in April 2013 alleging two-month-old R.B. was at risk of physical harm due to ongoing domestic violence between mother and her domestic partner. The petition further alleged there was an open reunification case for the minor's half sibling arising from mother's failure to follow through with assessments for the half sibling's serious medical and developmental conditions.

The report for the jurisdiction and disposition hearings noted the minor had feeding and breathing issues due to his premature birth and detailed the special care required by the foster parents.[4] A subsequent update stated the minor also displayed mild

---

[2] We granted the minor's trial counsel's petition for appointment of counsel for the minor on appeal in April 2016.

[3] Facts regarding the ICWA claims are found in section II with the related discussion.

[4] The minor was diagnosed with Stridor. Stridor is the term used for high-pitched breath sounds from turbulent airflow in the larynx caused by a narrowed or obstructed airway.

to moderate hearing loss and would require hearing aids.  In June 2013, the court sustained the petition as amended and ordered reunification services for mother.

The six-month review report in November 2013 recommended termination of mother's services and a permanent plan of adoption for the minor.  The report stated the minor now had hearing aids and was learning sign language.  The minor was found to have muscle development issues due to being premature which affected his balance and flexibility.  He also showed delays in fine motor skills and problem solving but was on target in other areas.  The foster parents were provided with activities and exercises to improve muscle tone and to support his development.  Mother had made minimal progress in services, visited inconsistently, was inconsistent with attending minor's medical appointments, and misrepresented the extent of her attendance and involvement in the required programs.

At the six-month review hearing in January 2014, the court adopted the Department's recommendation, terminating mother's reunification services and setting a section 366.26 hearing.  The minor subsequently was placed in a home which could provide permanency.

The report for the section 366.26 hearing stated that an alleged father, David C., had been found and served with notice of the hearing.  Father wanted custody of the minor, but was unsure of paternity.  A paternity test confirmed David C. was the minor's biological father.  He was unaware of the minor's existence until the Department's paralegal contacted him, and had never seen or visited him.  In April 2014, he was living with his four-year-old daughter and her mother, and also had a seven-year-old son, Z.C., by another woman.  Father said he was unemployed, had no dependency history and no history of violence.  However, the Department's record disclosed a substantiated allegation from 2013 for domestic violence with his daughter's mother.  Father had a criminal history which included a felony conviction for "human trafficking."  Father stated he was on informal probation for that but did not think he had been convicted.  The

3

report reiterated previous information on the minor's condition, including delays due to his premature birth, his hearing impairment, the need for hearing aids and his participation in sign-language services. The current caregivers wanted to adopt the minor and had completed the necessary home study interviews and classes. The report expressed concerns about the father due to his lack of relationship with the minor, his history of domestic violence and his lack of forthrightness. The Department recommended termination of parental rights with a permanent plan of adoption. An addendum report in May 2014 provided more specific information about father's criminal history.

Father appeared at the section 366.26 hearing in May 2014 and counsel was appointed for him. At a subsequent paternity hearing, the court found him to be a biological father and continued the hearing. At a contested hearing on paternity, mother testified that she originally did not think David C. was the father because she did not remember the night she had sex with him, but as the minor got older, his features resembled David C. and it occurred to her that he could be the minor's father. At the next hearing in August 2014, the parents signed a voluntary declaration of paternity, thereby establishing father's presumed status.

At the December 2014 hearing, the social worker testified that father had never met the minor before she set up monthly visits for him and she considered his relationship with the minor to be that of a friendly visitor. The social worker had discussed father's criminal convictions and domestic violence reports with him, both of which he minimized. The social worker also checked father's Facebook page and found several pages of photographs indicating gang involvement and drug use. The social worker believed it would be detrimental to place the minor with father.

Father testified he first found out about the minor in March 2014. He told the social worker he wanted the minor placed in his custody and asked for visitation. Father testified his other two children lived with him off and on. He explained the prior

4

Department referral was not due to domestic violence on his part and denied doing anything but arguing with the mother of his daughter. Father said he and the minor played and laughed at visits. Father had heard the minor speak during visits and believed the minor could hear him.

A second addendum report in January 2015 updated information on the minor's placement and special needs. The minor remained in the home where he was placed in March 2014. The minor continued to use hearing aids for bilateral hearing loss and his spoken vocabulary was increasing. He was examined at a neurology clinic in December 2014 to rule out cerebral palsy and was diagnosed with static encephalopathy, which would require appropriate therapy services from Alta Regional Center in addition to his other services. The Department again assessed father as not appropriate for placement of the minor due to his history of criminal behavior, recent arrest history, unemployment status and his lack of a relationship with the minor beyond a few monthly visits. Father questioned the social worker about the minor's health for the first time in January 2015 due to what he characterized as congestion and peeling fingernails. She explained that the minor had an ongoing breathing abnormality (Stridor) which would lessen over time and recent bouts with hand, foot and mouth disease.

A third addendum filed April 9, 2015, stated that a new social worker was assigned to the case. She interviewed father about his understanding of the minor's special needs and found father was aware of the minor's history of hand, foot and mouth disease but was unaware of any other medical conditions. Father insisted the minor heard him perfectly without hearing aids and, while father had some familiarity with sign language, he had not studied it for visits, but suggested the minor had taught him some signs. Father said he had the previous reports but no one told him the minor had brain damage and he had never seen anything "wrong" with the minor. When referred to the prior addendum of January 2015, which contained the diagnosis of static encephalopathy, father said he knew nothing about it but could read up on it. When the social worker

5

asked father if he had any history of domestic violence as to his other children he said he had never been offered a case plan, had never put his hands on his children and had never been convicted of a violent crime. Father acknowledged his last visit with the minor was in February 2015. Father told the social worker he did not have regular employment but worked "side jobs" for his uncle. Father was unable to provide proof of employment. The social worker noted father made conflicting statements about where he lived and how long. Father told the social worker he had contacted Alta Regional Center and would provide any services the minor needed in the home. He said the minor knew some colors, numbers, and shapes and, in father's opinion, the minor was "doing perfect." Father wanted the minor in his custody but said he would not do services and did not need help with anything. Father said Z.C. would be living with him in a shared custody arrangement with Z.C.'s mother but was not able to give the name of Z.C.'s school.

The minor's caregivers told the new social worker that the minor was under the care of a pediatrician, audiologist, neurologist and genetic specialist. The neurologist had recommended various types of therapy to address the minor's physical deficits. The caregivers also provided an assessment of the minor's needs which included: use of hearing aids and sign language with hearing evaluations every six months; speech delays requiring speech therapy in groups and individually; a diagnosis of static encephalopathy, due to his prematurity, which required therapy to address muscle tone and spasticity; poor coordination, balance and recurrent falling; and poor impulse control requiring guided help in play.

The social worker observed a supervised visit with father and the minor and reported that father was highly engaged and interacted with the minor throughout the visit. They played with toys father brought and father encouraged the minor to explore the items available in the visit room. Father was proactive in addressing safety concerns and redirecting the minor. Father also engaged the social worker emphasizing his view of the minor's strengths by stating, "No such thing as brain damage, he's well, he's

6

talking, you should see him throw a ball, he's got an arm." The social worker also observed the minor in his placement and saw evidence of his challenging behavior which required repeated redirection. However, the minor was relaxed and comfortable with his caregivers. The minor presented as a happy child and was comfortable with the social worker when left alone with her, showing little separation or stranger anxiety. The addendum concluded that placing the minor with father would be detrimental because father did not see that the minor had special needs, saw no need for services, denied any responsibility for the Department's involvement with his other children, denied wrongdoing with respect to his criminal convictions and could not provide proof of employment or safe and secure housing.

The hearing resumed April 14, 2015, with father's continued testimony. Father said he was uncertain about the minor's disability because he had no medical records and had to rely on what he had been told. He did not believe the minor had hearing loss based on his observation of the minor and the lack of hearing aids at visits. Father testified the first time he heard the minor was diagnosed with brain damage was after the last court hearing. He was very upset by the news but resolved that he would do whatever the doctor said to address the issue. Father described his new residence and expected that he would live there with Z.C. and the minor. Father had looked into daycare and could depend on help from relatives to care for the minor if he was given custody. He called Alta Regional Center to find out what to prepare for. He recognized that the minor was very active at visits and noted that "most kids are." Father testified he had a medical marijuana prescription due to past head injuries and used it from less than once a day up to four times a day. Father said he had not discussed the minor's disabilities with either the current or former social worker and had never received any medical records concerning the minor's disabilities. He tried to get information from hospitals, but was unable to do so without the minor's information.

The paternal grandmother confirmed father's new residence was ready for the minor to live there. She testified Z.C. often came to her house on weekends and after school during the week. Father and Z.C. lived with her off and on in the spring of 2015 but otherwise Z.C. lived with his mother. When Z.C. was younger he and father lived with her and Z.C.'s mother would visit. When they were staying with her, father took Z.C. to school and picked him up. She and father enrolled Z.C. in kindergarten and first grade and she believed Z.C.'s mother and father enrolled him in second grade. When father's daughter stayed with her during spring break, the paternal grandmother provided care with father's help. In the paternal grandmother's opinion, father's parenting of Z.C. was excellent and she had seen no evidence of neglect or abuse. She had observed father smoking marijuana three to four times a day.

The current adoptions social worker, Ms. Clark, testified she visited father's current residence and had no concerns about placing the minor in that home. Ms. Clark remained concerned about father's stability because she had not yet seen a pay stub. She briefly discussed the case with the former social worker who had several concerns about father including his arrest during the proceedings, his gang identification by law enforcement, the lack of pay stubs to verify his income, his minimal understanding of the minor's medical needs and his history with the Department as to his other children. She shared the concerns of the former social worker to a large extent. Ms. Clark stated that detriment to the minor arose from cumulative concerns rather than a single issue. Ms. Clark had spoken to father about the minor's two main medical issues, i.e., hearing loss and static encephalopathy from the permanent brain damage due to his premature birth but never discussed the symptoms or type of therapy the minor was receiving because father was not her client. The minor's medical issues were a factor in her decision that the minor could not be placed with father.

The adoptions worker further testified that she observed one visit between father and the minor and it was positive. She had no concerns about how father handled the

8

minor in that supervised setting but would have concerns on an extended basis and without supervision. The minor was busy and needed constant redirection and boundary setting. In the visit she did not recall seeing the symptoms of the minor's diagnosed disabilities with the exception that his gross motor development, i.e., gait and mobility, was not age appropriate. The minor was not wearing hearing aids in the visit because the foster parents did not send them to visits due to the risk that they might be damaged or broken and because they were hard to replace. When observing the minor in the foster home, the minor showed balance problems, delayed verbal, fine motor and gross motor skills, and an increase in defiance and "age-appropriate tantruming."

The adoptions worker said she was concerned father would not be able to engage the minor in services to address his medical issues based on father's inability to accurately tell her what grade and school Z.C. was in, or that Z.C. was getting special services at his school. She stated her assessment of risk was based on father's pattern of behavior with Z.C. If the minor were placed with father, there were services which could reduce, but not mitigate, the risk to the minor.

Following argument, the juvenile court took the matter under submission and subsequently issued its ruling on July 9, 2015. The court stated father was seeking to have the minor placed in his custody and that the finding of detriment to the minor was to be made by clear and convincing evidence. The court noted there was no formal petition for modification of prior orders, but that there had been no objection to the lack of a formal motion.

The court found that the Department had met its burden to show detriment by clear and convincing evidence. The court stated its factual findings in some detail, finding that the minor's conception was the result of mother's apparent encounter with multiple partners at a party, one of which was father. It was not until approximately May 2014 that father had any contact with mother or the minor, and he began visiting the minor after his paternity was confirmed. Visits were initially irregular but became more regular

9

as time went on. Father admitted he had little relationship with the minor and wanted to get to know him. Father did not know what the minor's disabilities were but was making attempts to find out. Father and the paternal grandmother testified about father's relationship with father's other two children, although the evidence regarding who cared for the children and addressed their educational needs was confusing. Father denied domestic violence with his daughter's mother but he did have a restraining order against her. There was also conflicting evidence on the extent of father's marijuana use. Due to the minor's premature birth, he had a number of physical disabilities, including hearing loss and static encephalopathy. The minor wore hearing aids and had learned sign language to communicate. The social worker observed the minor had delayed verbal, gross motor and fine motor skills and needed services that Alta Regional Center could provide. Father did not know what the minor's condition was but had found that Alta Regional Center services would follow the minor. Father said he observed that the minor heard well without the hearing aids and might not need them. The court found that father's perception of the minor's needs and his lack of interest in preparing himself to understand what was involved in caring for the minor contrasted sharply with the description provided by the minor's current caretakers of the minor's needs and the care necessary to meet them. The court found father's possible gang involvement and the circumstances surrounding his felony conviction for human trafficking were not primary factors, but might add to the other factors which led the court to conclude that placement of the minor with father was detrimental. Father had a year to demonstrate he was able to become the minor's primary caretaker. Although he made some minor efforts to do so, father had to demonstrate active parenting capability and did not. The court stated that father's "lackadaisical parenting style" might work for his other children, but the minor had greater needs and was more vulnerable than they were. If the minor did not get what he needed, he would suffer detriment and the evidence was clear that father was not up to the task of meeting the minor's special needs.

10

The court found the minor was likely to be adopted and that there was no compelling reason that terminating parental rights would be detrimental to the minor. The court adopted the Department's recommended findings and orders, terminating parental rights and freeing the minor for adoption.

## II. DISCUSSION

### A. *Detriment*

Father contends there was insufficient evidence to support a finding that placing the minor in his care would be detrimental to the minor.

When the sufficiency of the evidence to support a finding or order is challenged on appeal, even where the standard of proof in the trial court is clear and convincing, the reviewing court must determine if there is any substantial evidence—that is, evidence which is reasonable, credible and of solid value—to support the conclusion of the trier of fact. (*In re Angelia P*. (1981) 28 Cal.3d 908, 924; *In re Jason L.* (1990) 222 Cal.App.3d 1206, 1214.) In making this determination we recognize that all conflicts are to be resolved in favor of the prevailing party and that issues of fact and credibility are questions for the trier of fact. (*Id.* at p. 1214; *In re Steve W.* (1990) 217 Cal.App.3d 10, 16.) The reviewing court may not reweigh the evidence when assessing the sufficiency of the evidence. (*In re Stephanie M.* (1994) 7 Cal.4th 295, 318-319.)

Parents have a fundamental interest in the care, companionship, and custody of their children. (*Santosky v. Kramer* (1982) 455 U.S. 745, 758 [71 L.Ed.2d 599].) "Before a State may sever completely and irrevocably the rights of parents in their natural child, due process requires that the State support its allegations *by at least clear and convincing evidence*." (*Id.* at pp. 747-748, italics added.) California's dependency system satisfies *Santosky*'s due process requirements because, by the time of the section 366.26 hearing prior determinations have ensured "the evidence of detriment is already so clear and convincing that more cannot be required without prejudice to the interests of the adoptable child." (*Cynthia D. v. Superior Court* (1993) 5 Cal.4th 242, 256; *In re*

11

*Gladys L.* (2006) 141 Cal.App.4th 845, 848; accord *In re Frank R*. (2011) 192 Cal.App.4th 532, 537.) California's dependency scheme does not use the term " 'parental unfitness,' " requiring instead that the juvenile court find that awarding custody of a dependent child to a parent would be detrimental to the child. (*In re Dakota H*. (2005) 132 Cal.App.4th 212, 224, fn. 3.)

In the average case, where both parents are known, or become known, during the reunification period and repeated findings that placing or returning the child to the parent would be detrimental to the child have been made, no further finding of detriment is required at the section 366.26 hearing. However, to comport with due process, such a finding must be made at some point in the dependency *prior* to termination of parental rights, whether in a separate hearing or as a part of the section 366.26 hearing. (*In re Gladys L., supra*, 141 Cal.App.4th at pp. 848-849.)

The evidence before the court, while conflicting in some respects, established that placing the minor in father's care would be detrimental to the minor.

The trial court mentioned, but did not significantly rely on, the facts of the minor's conception and father's possible gang involvement and criminal history in making its decision. What was more important, as the adoption worker testified, were father's patterns of behavior including rationalizing and minimizing his responsibility for his felony conviction and domestic violence history with his daughter's mother. These patterns extended to his relationship with the minor and his other children. Father consistently minimized or denied the existence of the minor's disabilities and failed to recognize evidence of them which were apparent to others. Father also blamed others for not telling him specific information about those disabilities and how they impacted the minor's needs, although the information was in the social worker's reports. Rather than making reasonable efforts to become informed about the minor's condition and treatment, such as asking the social worker for information, access to medical reports and the minor's treatment team or seeking assistance of his counsel in getting such information,

12

he called hospitals which may or may not have even treated the minor and which could not give him information in any case. He also failed to recognize that vague promises to research or read up on minor's disabilities, their causes and how they impacted the minor, or insistence that he would do whatever was necessary for the minor, were not enough to demonstrate his current ability to meet the minor's needs. Indeed, evidence of his current parenting of his other two children did not show he was capable of being a primary caregiver. Where and with whom the older children lived was unclear, although it appeared that parenting them was shared between their mothers, the paternal grandmother and father, with the mothers and paternal grandmother generally acting as primary caregivers with father's support. Father did not know specifics about Z.C.'s school or educational performance and evidence of the degree of his involvement with that child's education was in conflict. The minor, due to his prematurity and resultant needs, required committed, hands-on, active parenting as well as in-depth understanding of his needs and how to meet them. Father's patterns of behavior and interaction with his other children lead unavoidably to the conclusion that his part-time, lackadaisical parenting style, coupled with his evasion of personal responsibility, would result in detriment to the minor if the minor were placed with him. Substantial evidence supports the juvenile court's finding that such detriment existed.

B.     *ICWA Issues*

      1.     *Factual Background*

At the outset of the dependency, mother claimed Indian heritage and named several tribal groups including the Mono tribes. The minor was placed in an ICWA compliant home after being released from the neonatal intensive care where he stayed following his premature birth. In May 2013, notice of the proceedings was sent to various tribes including the North Fork Rancheria. The paralegal responsible for investigation of ICWA claims and noticing any identified tribes spoke to the maternal grandmother in April 2013, who said mother and the maternal grandfather were in the

13

process of enrolling in a tribe and were waiting on paperwork. Several months later, the paralegal reported that there were no positive responses to the notices and that the North Fork Rancheria was one of several tribes that did not respond to the notice. In August 2013, the court found no further ICWA notice was required.

Initially when questioned about the minor's paternity, mother was unable to identify the minor's father and provided only a possible first name, "Charles." Subsequently, she identified David C. as a possible father.

The report for the section 366.26 hearing stated that the alleged father, David C., was located and served with notice of the hearing. Paternity testing confirmed he was the minor's biological father. Father filed an ICWA-020 form which stated he may have Indian heritage but the tribe was unknown.

At the December 18, 2014, section 366.26 hearing, counsel for the Department informed the court that a representative of the North Fork Rancheria had contacted the Department. The social worker returned the call and spoke to Renee Getty, chief administrative officer of the tribe, who said they had no documentation that the tribe was ever noticed of the proceedings regarding the minor. Counsel noted there was documentation consisting of the return receipt signed in May 2013 by an individual who was terminated from the tribe at about that time. Getty requested that the Department send another notice form, ICWA-030, and that was done. Getty also requested a continuance of the hearing so the tribe could evaluate the eligibility. The court denied the continuance, finding it would not be in the best interest of the minor and there was still no reason to know the minor was an Indian child based on the ancestry of either parent.

A letter dated December 22, 2014, from the tribe's enrollment technician to Ms. Getty confirmed the minor was eligible for enrollment in the North Fork Rancheria.

At the hearing in January 2015, Ms. Getty of the North Fork Rancheria was present telephonically and explained that the tribe would not intervene in the case because the hearings were taking place beyond a 75-mile radius from North Fork. The

14

tribe researched their records and found the minor was eligible for enrollment, however mother was not enrolled and not currently eligible for enrollment because enrollment is closed for any member over the age of 18. The tribal council would determine when enrollment would reopen, but it had not been opened since 2006. The social worker asked if she could continue to attempt to get the minor enrolled. Ms. Getty responded that the only way enrollment could currently occur was if the child was under the age of two "and/or if the child wouldn't qualify under ICWA. And ICWA would be at the discretion of Tribal Council whether or not they allow that child to be brought into the Tribe or not." Ms. Getty stated that due to the minor's age, he would be eligible for enrollment until February 8, 2015. The social worker stated she had already submitted the paperwork.

At the February 13, 2015, hearing, minor's counsel stated that the minor was eligible to enroll in the tribe until age two and that the social worker had submitted the paperwork to get him enrolled. Counsel indicated that she had tried, without success, to contact the tribe on the minor's current status and suggested that there would need to be an ICWA expert to proceed with the hearing. The court asked for briefing on the issue. Counsel for the Department stated that he would contact Ms. Getty, the tribal representative, about the minor's status and inform the court at the next hearing. The hearing was continued twice by stipulation and no mention was made regarding the minor's enrollment status at the next hearing on April 1, 2015.

At the close of testimony on May 4, 2015, the parties had a discussion about the minor's ICWA status. Father's counsel stated that she and minor's counsel had made multiple attempts to contact the tribe but the telephone calls had not been returned. The question of the minor's eligibility or enrollment was not resolved.

2.    *Legal Framework*

The ICWA protects the interests of Indian children and promotes the stability and security of Indian tribes by establishing minimum standards for, and permitting tribal

15

participation in, dependency actions. (25 U.S.C. §§ 1901, 1902, 1903(1), 1911(c), 1912.) The juvenile court and the Department have an affirmative duty to inquire at the outset of the proceedings whether a child who is subject to the proceedings is, or may be, an Indian child. (§ 224.3, subd. (a); Cal. Rules of Court, rule 5.481(a).) If, after the petition is filed, the court "knows or has reason to know that an Indian child is involved," notice of the pending proceeding and the right to intervene must be sent to the tribe or the Bureau of Indian Affairs (BIA) if the tribal affiliation is not known. (§ 224.2; see Cal. Rules of Court, rule 5.481(b); 25 U.S.C. § 1912.) However, notice is not required when the parent provides information that is too vague or speculative to give the court reason to know the minor is an Indian child. (*In re O.K.* (2003) 106 Cal.App.4th 152, 155-157; *In re J.D.* (2010) 189 Cal.App.4th 118, 125.)

"Aside from its notice provisions, the ICWA applies only to Indian Children. [Citations.] Only when information before the juvenile court is sufficient to show that the child is a member of a tribe, or is eligible for membership and is the child of a member, does [California Rules of Court, rule 5.482(d)(2)] require compliance with all of the provisions of the ICWA." (*In re L.B.* (2003) 110 Cal.App.4th 1420, 1427, superseded by rule on other grounds.) These provisions include the requirement that "No termination of parental rights may be ordered in [a dependency proceeding] in the absence of a determination, supported by evidence beyond a reasonable doubt, including testimony of qualified expert witnesses, that the continued custody of the child by the parent . . . is likely to result in serious emotional or physical damage to the child." (25 U.S.C. § 1912(f).)

> 3. *Appellants' and Minor's Claims*
>> a. *Father's Claim*

Father argues that reversal is required because the Department did not send a second notice to the tribes after he was found to be the minor's biological father. We disagree.

16

Father's ICWA-020 form stated merely that "I may have Indian ancestry," and listed the name of the tribe(s) as "Unknown." This information is too vague to trigger notice since nothing in father's ICWA-020 form gave either the Department or the court any reason to know that, based on father's ancestry, the minor was, or might be an Indian child. Because no notice was required, there was no error in failing to send a second notice.

### b. Mother's Claim

Mother contends reversal is required because the minor was eligible for enrollment and she was treated as a tribal member although she was not enrolled, thus, the substantive provisions of the ICWA should have been applied. Again, we disagree.

ICWA defines an Indian child as an "unmarried person who is under age eighteen and is either (a) a member of an Indian tribe or (b) is eligible for membership in an Indian tribe *and* is the biological child of a member of an Indian tribe." (25 U.S.C. § 1903(4), italics added.)

Mother relies only on part (b) of section 1903, subdivision (4). It is true that up to the minor's second birthday, he was eligible for membership in the North Fork Rancheria and was mother's biological child. However, the tribal representative made it clear that mother was not a member of the tribe and was not currently eligible to apply for membership. The second definition of an Indian child was not satisfied and the substantive provisions of the ICWA did not apply to the minor.

Mother argues the statutory requirements were met because she was treated as a member of her tribe. ICWA does not recognize such treatment, assuming it existed, as sufficient connection to the tribe to confer Indian child status on the minor. The parent must be a member of the tribe and mother was not.

However, it is unclear whether the minor was a member of an Indian tribe pursuant to of section 1903, subdivision (4)(a) prior to the conclusion of the section 366.26 hearing. Although the social worker had sent the enrollment paperwork for the

17

minor to the tribe prior to his second birthday, there was no evidence before the court whether or not the tribe had accepted the application and enrolled the minor or determined, on criteria unknown to the court and the parties, that the minor would not be enrolled. Although the issue was raised more than once during the section 366.26 hearing, the court neither suspended proceedings for the purpose of clarifying the minor's status nor directed the Department to contact the tribe for clarification.[5] The court instead terminated parental rights without knowing whether an Indian expert was required. Reversal and a conditional remand is required to determine whether the substantive provisions of the ICWA should have been applied in this case.

### c. Minor's Claim

The minor argues that the court erred in failing to treat him as an Indian child based on the totality of the evidence of his eligibility to enroll.

The minor's claim ignores the rule that it is up to the tribe to determine whether a child is, or is not, a member and thus is an Indian child. (§ 224, subd. (c); *Dwayne P. v. Superior Court* (2002) 103 Cal.App.4th 247, 255.) The fact of mere eligibility is insufficient in this case where it is clear from the social worker's actions and the information from the tribe, that, at the very least, a membership application had to be filed and considered. As noted above, the application was sent, but the results of the tribe's consideration of it are unknown.

### III. DISPOSITION

The orders terminating parental rights are reversed and the matter is remanded for the limited purpose of determining whether or not the tribe considered the minor to be a member and thus, whether the substantive provisions of ICWA, i.e., the need for an

---

[5] The Department's counsel volunteered at one point to contact the tribe, but the record does not show whether this contact was made, or if it was, whether counsel informed the court of the results of that contact.

Indian expert and the heightened burden of proof, should have applied at the section 366.26 hearing. The juvenile court shall order the Department to send an inquiry regarding the minor's membership status to the North Fork Rancheria, giving the tribe thirty (30) days to respond. If there is no response by the tribe, the orders terminating parental rights shall be reinstated. However, if the tribe informs the court that the minor is a member of the North Fork Rancheria, the juvenile court is ordered to conduct a new section 366.26 hearing in conformance with all provisions of the ICWA.

/S/

---

RENNER, J.

We concur:

/S/

---

NICHOLSON, Acting P. J.

/S/

---

MURRAY, J.

19